**UNITED STATES, Appellee,**

**v.**

**Sergeant Michael J. TEETER, SSN 088–44–4982, United States Army, Appellant.**

**CM 439290.**

U. S. Army Court of Military Review.

25 Nov. 1981.

Captain Edward J. Walinsky, JAGC, argued the cause for the appellant. With him on the brief were Colonel Edward S. Adamkewicz, Jr., JAGC, Major Raymond C. Ruppert, JAGC, and Major Charles A. Byler, JAGC.

Captain John L. Plotkin, JAGC, argued the cause for the appellee. With him on the brief were Colonel R. R. Boller, JAGC, Major Douglas P. Franklin, JAGC, and Major John T. Meixell, JAGC.

Before MITCHELL, Senior Judge, and LEWIS and FOREMAN, Appellate Military Judges.

## OPINION OF THE COURT

LEWIS, Judge:

The appellant was found guilty of premeditated murder, felony murder, and rape in violation of Articles 118 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 920 (1976), and was sentenced to a dishonorable discharge, confinement at hard labor for life, and forfeiture of all pay and allowances. He contends that the evidence was insufficient to convict him, that the military judge erred in not suppressing certain statements made to an Army Criminal Investigation Division (CID) agent, that error was committed in the admission and rejection of evidence at trial and that the military judge erred in instructing the members. We affirm.

On 8 November 1979, Eva Ransom was raped and brutally murdered. She was found by her husband at approximately 1140 hours lying on the bedroom floor of their on-post quarters located one floor above the quarters occupied by appellant and his wife. Mrs. Ransom was wearing only a sweater, a bra, and a pair of socks. Her hands were bound behind her back by two brassieres and she was lying between the foot of the bed and a wooden chest of drawers.

Specialist Four Ransom tried to telephone the military police from the bedroom but was unable because of the shock of what he had seen. He ran downstairs to appellant's quarters, knocked, and ran into the kitchen. He saw Mrs. Teeter, appellant's wife, and Maxon Painter, a utilities repairman. He told them what had happened and Mrs. Teeter went to get appellant, who came from the bedroom-bathroom area of their apartment. The Teeters and Ransom went upstairs but, according to Ransom, at no time while they were in his apartment did appellant approach the bedroom where the body was located.

Ransom went into an adjoining room to check on his year old daughter and when he exited he found appellant fumbling with the telephone in the kitchen. Mrs. Teeter took the phone from her husband and called the military police. Ransom then called his wife's parents and noted that the time was 1145 hours.

Leaving his wife and Ransom upstairs, appellant ran downstairs and outside where he again encountered Mr. Painter. Appellant appeared excited and said, "I just raped a woman and she's bleeding like hell." Stunned, Painter asked, "You what?" Appellant replied, "She's been raped and she's bleeding like hell."

Appellant went back upstairs and Painter told his daughter, who had accompanied him, to summon the military police who arrived about five minutes later.

The military police checked the murder scene. A blood-soaked towel and a pool of blood was found under the body. A pillowcase bearing slash marks lay between the bed and the telephone table. Panties and blue jeans were found in a corner of the bedroom. Bits of broken brown plastic were scattered about on the floor and under the victim's head. The mattress was pulled down two to three feet from the headboard. There were a few bloodstains on the wall but most of the blood was concentrated under the body and in the middle of the mattress. In the wooden chest, the lingerie drawer had been opened approximately three inches. In the bathroom, a bar of soap was wet and the sink contained the diluted remnants of blood.

A physician, arrived on the scene and a little after 1200 hours pronounced Eva Ransom dead. His examination revealed her skin to be warm and pliable. The corneas of her eyes were still clear. He believed she probably died after 1100 hours.

The autopsy revealed thirty-two stab wounds on the body. Fifteen were in the front of the chest, the deepest being 3½ inches in depth and the width of the wounds was one inch. Seventeen stab wounds were found in the upper back, one inch in width with the deepest being almost four inches in depth. The head was almost severed. The front of the neck was slit, the wound being five inches long and separating the wind pipe. There was a similar wound on the back of the neck. Concealed

under the hair and not discovered until the autopsy were lacerations and contusions on both temples. No defensive wounds were found on the hands or arms.

It was the opinion of the pathologist, Major Goodhue, that the wounds were inflicted by a sharp instrument. He believed that the head injuries occurred while Mrs. Ransom's circulation was still active. They were sufficient to cause unconsciousness but not death. An absence of blood from the heart and of bleeding from the torso wounds indicated that these stab wounds had been inflicted when circulation was either minimal or halted. A massive quantity of blood was found in the lungs indicating aspiration of circulating blood from the severed windpipe and infliction of the neck wounds prior to those on the torso.

It was about an hour after the military police had arrived at the murder scene before appellant was asked to accompany Special Agent Cutler to the CID office. In the interim, CID agents had been talking to various persons at the scene, including Painter and appellant. Appellant was seen roaming around the area during this period.

When appellant arrived at the CID office, he was warned of his rights under Article 31, UCMJ, 10 U.S.C. § 831 (1976). He executed a waiver of these rights and spoke to Special Agent Cutler. Appellant was subsequently taken to a hospital where he provided fingernail clippings and hair samples. He was returned to the CID office where he later rendered a written exculpatory statement.

At about 2200 hours, appellant's wife brought him a change of clothing and his uniform was seized as evidence. He was soon informed that he was under apprehension for the murder and rape of Mrs. Ransom and transported to a detention cell in the military police station.

The next day, appellant made incriminating statements to Special Agent Robinson during interrogation. They first talked about how appellant came to Fort Campbell. Then appellant spoke about his interest in witchcraft and how he utilized it in Germany to overcome peer pressure to use drugs. He also explained that he could put himself into a trance-like state and that on one occasion his companions had to singe his eyebrows to bring him out of a trance. Then Robinson asked him if he could give him any details of what occurred the day before. Appellant became nervous and his hands started shaking. His eyeballs rolled back in their sockets, his eyelids fluttered and his voice got deeper and a little less audible. Asked if there was any real doubt in his mind that he killed Mrs. Ransom, appellant pointed to his head and said, "Something up here is telling me I may have done it." When asked if he remembered anything that occurred after he arrived at home and parked his car, he said he didn't remember anything afterwards until he woke up on the couch in his living room listening to country and western music. When asked where the knife was hidden, he closed his eyes and said he had a vision of the knife in some tires.

After hearing this possible location of the knife, Robinson told appellant to relax. Robinson left the interrogation room to tell another investigator about the knife and then returned. At appellant's request, Robinson brought him a soft drink. About five minutes later, Robinson asked about the tattoo of Jesus Christ on his chest. Appellant said it symbolized truth and power. It was part of his witchcraft and its purpose was to overcome the power of evil and the devil. He described how the devil, a sheeplike character with horns, had instructed him to condemn ten people to death. Asked if Eva Ransom was the first person so condemned, appellant said, "The animal is telling me I killed Eva." Appellant then began to shake and said, "The devil is laughing at me, I'm trying to kill the devil." Robinson said, "Is the devil in Eva?" "Yes," the appellant replied. Robinson queried, "Did you kill Eva?" Appellant responded, "I stabbed him." Robinson again asked, "Is the devil in Eva?" and appellant said "Yes." Robinson inquired "Are you killing the devil?" Appellant said, "Yes" while making stabbing motions with his right hand. He then broke down crying and was consoled by Robinson.

During a five minute break, the appellant composed himself. Robinson again asked what occurred the day before at the Ransoms' quarters. Appellant again appeared to go into a trance-like state. He said the devil was in Eva Ransom and he remembered "running and chasing." He repeated this phrase four times. He chased her into her bedroom where he caught her as she ran across the bed. She then fell at the end of the bed and hit her head on something brown. She did not move and he tied her hands behind her back with "something from a drawer." The devil took the knife and "ran and laughed." On further questioning appellant said he hid the knife and that it was not a "special knife." He said the devil was with him in the bedroom but he denied having sexual intercourse with Eva Ransom although the evidence showed both vaginal and oral intercourse.

After this interview concluded, Robinson tried to get a written statement but failed because appellant said he couldn't remember what he told him.

Appellant did not testify at trial. The defense theory was a three-pronged attack. The first was alibi. Appellant's duty assignment was located 7 to 8 minutes by car from his quarters. There he assisted as a proctor in the administration of a skill qualification test. Testimony from appellant's witnesses, who consisted of persons who took the test and other proctors, had appellant departing from work at various times after 1100 hours. One witness, Sergeant Fedorchuk, placed appellant on the way home and at an intermediate intersection at 1125 hours.

The second attack on the Government's case was based on the lack of scientific evidence connecting him with the crime. Major Goodhue, the pathologist who did the autopsy, prepared swab samples of fluid from the victim's vagina, rectum, and mouth. While all of the swabs showed the presence of semen, he concluded that the sample from the rectum was probably the result of contamination from the vagina rather than as the result of anal intercourse. Although later tests showed appellant had a normal sperm count, none of the samples of semen taken from the body contained sperm.

The blood tests of Eva Ransom and appellant showed both had Type A blood, but the type of an enzyme contained in blood known as PGM was not the same. The victim had PGM Type 1–1 whereas appellant had type 2–2. No trace of PGM Type 2–2 was found on the swabs.

The clothing which was taken from appellant on the night of 8 November disclosed no blood stains. No pubic or head hairs from appellant were found on the victim or at the scene, and none of appellant's fingerprints were found at the scene.

The third prong of the defense theory was an attack on appellant's statement to Agent Robinson which appellant tried to show was made under physical duress and while in a trance.

Other facts will appear as they relate to the assignments of error under discussion.

I

*Insufficiency of the Evidence*

Pointing to the alibi and scientific evidence, appellant claims the Government failed to prove its case beyond a reasonable doubt.

We shall therefore make an independent determination of the facts of the case and must be convinced beyond a reasonable doubt of accused's guilt, *United States v. Taliau*, 7 M.J. 845 (ACMR 1979), recognizing that the trier of fact saw and heard the witnesses, *United States v. Michaud*, 2 M.J. 428 (ACMR 1975). In performing this function we shall also be guided by other principles. The doctrine of reasonable doubt applies to proof of guilt and not to the establishment of each incident or event inculpating the accused. *State v. Raine*, 93 Idaho 862, 477 P.2d 104 (1970). It is not necessary that each particular fact advanced by the prosecution should be proved beyond a reasonable doubt; it is sufficient to warrant a conviction if, on the whole evidence, the trier of

fact is satisfied beyond a reasonable doubt that the accused is guilty. *Brandom v. United States*, 431 F.2d 1391 (7th Cir. 1970).

In determining the weight and sufficiency of the evidence as to the guilt or innocence of the accused, the evidence must be considered as a whole. *United States v. Collins*, 383 F.2d 296 (10th Cir. 1967). The rule requiring the trier of fact to be convinced beyond a reasonable doubt of the guilt of the accused does not require the evidence to be free of conflict. *State v. Money*, 110 Ariz. 18, 514 P.2d 1014 (1973). If the evidence is in conflict, it should be reconciled by the trier of fact if reasonably possible. *Jamerson v. United States*, 66 F.2d 569 (7th Cir. 1933). The existence of conflict does not necessarily mean that the accused's witnesses are right and the prosecution witnesses are wrong. *Jabczynski v. United States*, 53 F.2d 1014 (7th Cir. 1931). The testimony of the witnesses for the prosecution may be believed as against the testimony of the witnesses for the accused. *United States v. Pugliese*, 346 F.2d 861 (2d Cir. 1965); *United States v. Stork*, 421 F.2d 180 (10th Cir. 1970).

Turning to the alibi evidence, we find it to be contradicted not only by Mr. Painter, but by the accused himself. Painter, had been called at 1045 hours to go to the Teeter quarters to repair a heat pump. Accompanied by his daughter, he arrived at approximately 1120 hours. He parked his van in front of the building. The garage doors for both the Teeter and Ransom quarters were closed. As he and his daughter walked up to the Teeter's front door, they saw appellant standing by the entrance to Ransom's garage. He was wearing fatigues but no hat and appeared surprised to see them. Although appellant was wearing a sheath containing a jack-knife when he was at work earlier that day, Painter did not observe one on appellant at that time.

The Painters were admitted to appellant's quarters by his wife. Painter began his maintenance work and after 3 to 5 minutes he had to examine the outdoor components of the heating unit. Mrs. Teeter showed Painter and his daughter the way out through the kitchen door and garage. The Painters saw Teeter's car in the garage. They returned to the quarters after about 2 to 5 minutes and then saw appellant come in from the garage.

In his written statement which was admitted into evidence, appellant said he left work after 1100 hours, that it took him ten minutes to get to his quarters, and that when he pulled into the housing area he was following the Painters' van. The van stopped in front of his quarters forcing him to go around the van to get into his garage. He then went into his quarters, saw the Painters inside, went into the living room and turned on the stereo. About 20 minutes later Specialist Ransom came in screaming about his wife. Appellant later told a CID agent that he had been home 30 minutes before Ransom came downstairs.

The alibi evidence boils down to this: Mrs. Ransom was probably murdered after 1100 hours. Appellant was seen by the Painters at approximately 1120 hours standing outside. Neither of the Painters had any motive to fabricate, but appellant did. His testimony that he followed the Painter van to his quarters is inconsistent with the Painters' testimony. Appellant, by his own written and oral admissions, placed himself at his quarters between 1110 hours and 1120 hours. Being cognizant of the fact that people are not constantly checking their activities with a watch, we believe the evidence shows appellant had ample time and opportunity to commit the crime.

Although there was no dispute between the expert medical witnesses as to the results of tests made on the swabs taken by Dr. Goodhue, there was some difference of the interpretation and significance of these results. Appellant had a normal sperm count, Type A blood, and his PGM Type 2–2. The victim was also Type A blood, but was PGM Type 1–1. The semen contained on the swabs from the vagina, mouth and rectum lacked sperm. Major Goodhue testified that if morphologically intact sperm are not found, the sample is interpreted as showing no sperm. He further stated that

sperm can disintegrate in 30 minutes. He did not take the swab samples until at least four and a half hours after the death.

Mrs. Stopper, an expert in forensic chemistry at the Criminal Investigation Laboratory, Fort Gordon, Georgia, made a later examination of the swabs taken by Major Goodhue. The oral and rectal swabs showed an absence of semen which was probably attributable to disintegration of the samples. The vaginal swabs showed the presence of semen in the vaginal fluid. The blood type present in these swabs was A but there was no PGM Type 2–2. The rectal hairs showed the presence of semen and indicated Type A blood with PGM Type 1–1. Mrs. Stopper felt that the location of the rectal hairs precluded contamination by vaginal fluids. She finally concluded that it was unlikely that appellant's semen was present. However, she could not exclude appellant as the donor of the semen.

Another forensic scientist, Mr. Wraxall, testified that seminal PGM is more labile in contact with vaginal fluid and that the presence of PGM in the semen can be nil and yet the PGM in the vaginal fluid will still be present. He was unable to detect any PGM in the semen on the rectal hairs, probably due to lapse of time. However, based upon his testing of the vaginal swabs he could not exclude appellant as the donor of the semen.

When the testimony of all of these experts is put together, we find that the blood type of the semen did not exclude appellant as the donor. The sperm could have disintegrated by the time the swabs were examined by Major Goodhue, thus explaining the absence of sperm; the semen on the rectal hairs was probably seepage from the vagina and it did not display PGM 2–2 because of the instability of that enzyme when in contact with vaginal fluid.

The lack of blood on appellant's fatigues, and the failure to find his fingerprints can be rationally explained. Appellant had ample time to change his uniform after he returned to his quarters and later. After the military police arrived he was free to come and go for an hour. Furthermore, Major Goodhue thought the lack of blood from the chest and back wounds was remarkable. A towel was used to soak up the blood from the victim's neck wounds and most of the blood had gone into her lungs. We find nothing unusual in the fact that his fingerprints were not found in the bedroom.

Appellant's last attack was on his statements to Agent Robinson. He tried to show through expert witnesses that he was susceptible to stress to such an extent that he might confess when he didn't intend to do so. However, the experts did not believe that he would necessarily lie when he confessed. No expert on appellant's mental condition believed appellant was suffering from a mental defect or disease.

What do we conclude from the three theories advanced by appellant? His alibi does not hold water, the scientific evidence proves nothing one way or another and his confession, although maybe unintended, was believable. We also further note that his so-called "trance" only occurred when Agent Robinson specifically asked him about the Ransom killing. Appellant's facile ability to turn his "trance" on and off belies its reality.

Considering the evidence as a whole, we find that appellant had the opportunity to commit the crime and falsified concerning the time he arrived at his quarters. His customary knife, the blade which was the approximate length of the deepest wounds on the victim, was not on his person when he was seen by the Painters nor when he was apprehended, even though he wore it at work on the morning of the murder. It was never found although a thorough search was made of the Teeter quarters and several other knives were seized. This leads to a conclusion that it was disposed of. His "freudian slip" in front of Mr. Painter that he had just raped a woman is consistent with expert testimony that he would be prone to blurt out the truth. When interviewed by the CID, he confessed to the crime and in doing so showed that he knew something about the crime which wasn't known until an autopsy, the fact that Mrs. Ransom had suffered injuries to the head.

He said she fell and hit her head on something brown and there were small pieces of brown plastic near the body and under her head. It is also significant that in his written exculpatory statement appellant said the victim's hands were tied with pieces of sheet cut from the bed. In his "trance" he said she was tied with something from the drawer which was in fact logical since she was tied with brassieres like those in the lingerie drawer.

■ Since appellant had no visible blood on his fatigues when seen by the Painters, we conclude that the rape occurred after Mrs. Ransom had been rendered unconscious and before she had been stabbed or her throat slit. Further support for the rape-before-mortally wounding conclusion is the fact that the victim was bound, an unnecessary requirement for necrophilia, but a logical step if a victim were temporarily unconscious. We therefore conclude, that the Government proved appellant's guilt beyond a reasonable doubt.

## II

### Appellant's Statements to Robinson

Appellant contends the military judge erred in refusing to suppress the statements made to Special Agent Robinson because they were the result of deprivation of food, sleep, adequate clothing, a trance and after requesting a lawyer. We do not agree.

■ The burden is on the government to show by a preponderance of the evidence that the statements were voluntary. *United States v. Bell*, 7 M.J. 108 (CMA 1979). Appellant was initially interrogated at the CID office on 9 November 1979 by Special Agent Blackwood. This interrogation was terminated after about four hours, during which a lie detector test was taken. Blackwood testified that appellant became upset with him and said he didn't want to talk to him any more. Blackwood left, summoned Agent Robinson and told him that appellant didn't want to talk to him (Blackwood) anymore. When Robinson came into the interview room and started talking, appellant never indicated that he didn't want to talk or that he wanted a lawyer. Appellant claims he told Blackwood he wanted a lawyer and that when Blackwood went outside he heard him tell Robinson that he wasn't going to get a lawyer.

■ If the accused was believed, continuation of the interrogation was improper. *United States v. Muldoon*, 10 M.J. 254 (CMA 1981); *United States v. Hill*, 5 M.J. 114 (CMA 1978); *United States v. Howard*, 18 U.S.C.M.A. 252, 39 C.M.R. 252 (1969). However, if the agents were believed, the appellant was not persuaded to change from silence to speech by the agent's technique, but merely to address himself to one of the agents in preference to the other. Appellant never testified that he was psychologically pressured to talk to Robinson, and the evidence, considered as a whole, does not reveal any such pressure. The military judge believed the agents and not appellant. We agree with his assessment of the conflicting testimony. *See United States v. Howard, supra.*

■ As for the other claims of coercion, the record simply does not sustain them. Appellant was given the opportunity to sleep the night before the interrogation and apparently he slept. Although he was tired the next day, he never claimed he made any statements because he was too tired to resist. In fact, he was taken home so that he could rest there. He was given opportunities to eat, smoke, and relax. Again, he never claimed that the statements were induced by any deprivation of human comforts. As for the "trances," we have already indicated our disbelief of their reality and the military judge obviously did the same.

Based on the totality of the circumstances, the military judge did not err in refusing to suppress.

## III

### The Admission of Remote Statements

■ Over appellant's objections, the military judge allowed three military witnesses, who knew appellant, to relate what

he had said about one year prior to the murder. Appellant told them about ways of torturing and killing women which involved the insertion of a foreign object into the vagina. He also described his dealings with the devil and his desire to escape the devil's control. He further told two of these witnesses of his admiration for the notorious Charles Manson whose "desciples" [sic] committed murders where the victims received multiple stab wounds. Appellant contends the evidence was remote and irrelevant. We do not agree.

This testimony was admissible to prove appellant's motive and intent. *United States v. Emerson*, 16 C.M.R. 690 (AFBR 1954), *pet. denied*, 5 U.S.C.M.A. 843, 17 C.M.R. 381 (1954); paragraph 142*d*, Manual for Courts-Martial, United States, 1969 (Revised edition) (MCM 1969 (Rev)). Appellant's extreme misogyny explains the brutality of the rape-murder. His discussions about the devil corroborate his statements to Robinson and shed light on his motive for murder. His admiration for the way Charles Manson was able to control people also sheds light on his motive and intent in murdering and raping Eva Ransom and the way he accomplished it. At least for a short period of time he sexually controlled Eva Ransom and then exercised the ultimate control by taking her life. That these conversations took place a year prior to the crime does not make them inadmissibly remote.

 Appellant contends that the probative value of this evidence was outweighed by its prejudicial danger. We do not agree. The admissibility of evidence and the weighing of probity against prejudice are matters for the military judge to determine. *United States v. Weaver*, 1 M.J. 111 (CMA 1975); *United States v. Thomas*, 6 U.S.C.M.A. 92, 19 C.M.R. 218 (1955). In weighing the probative value of evidence against the dangers of prejudicial impact, the general rule is that the balance should be struck in favor of admission. *United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980).

 Paragraph 142*d*, MCM 1969 (Rev), provides that statements of motive or intent are admissible when made under circumstances not indicative of insincerity. The statements concerning torture were made during a drinking session and were described by one witness, Specialist Four Papu, as "b___s___." Appellant contends this shows his statements were not sincere. We do not agree. While Papu thought the statements were "b___s___," he believed appellant was serious and we do not believe the drinking would necessarily belie the truth of the statements. We conclude that the military judge did not abuse his discretion in the admission of this evidence.

## IV

### Evidence of Premeditated Murder

 The military definition of premeditation is found in paragraph 197*b*, MCM 1969 (Rev). According to this provision, premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time and the existence of premeditation may be inferred from the circumstances surrounding the killing.

 The evidence shows that appellant chased the victim until she fell and was rendered unconscious. He then tied her up, raped her, and, after placing a towel around her neck to catch the blood, proceeded to slit her throat. He then finished up by stabbing her 32 times, but by then the lethal wounds, those to the throat, had already been inflicted. Premeditation can be inferred from the viciousness of the assault. *United States v. Ayers*, 14 U.S.C.M.A. 336, 34 C.M.R. 116 (1964); *United States v. Harris*, 6 U.S.C.M.A. 736, 21 C.M.R. 58 (1956); *United States v. Riggins*, 2 U.S.C.M.A. 451, 9 C.M.R. 81 (1953).

Appellant also contends the trial court erred in instructing the members on premeditation. We observe that no objection was made in the trial court. In any event, the instruction was not erroneous.

726

## V

### Felony-Murder Rule

▉ Appellant contends the murder-felony rule is an anachronism and should be abolished by us. We do not agree. The rule is found in Article 118(4), UCMJ, 10 U.S.C. § 918(4) (1976). It is fundamental that the judiciary may not encroach upon the functions of the legislature or usurp its powers. *Schnell v. Peter Eckrich & Sons*, 365 U.S. 260, 81 S.Ct. 557, 5 L.Ed.2d 546 (1960); *McCray v. United States*, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78 (1904). Since the power to repeal laws is legislative, courts will not encroach upon the domain of the legislative branch by judicial repeal of legislative enactments. · *Ebert v. Poston*, 266 U.S. 548, 45 S.Ct. 188, 69 L.Ed. 435 (1925). Courts do not sit to revise legislative action, nor do they determine the wisdom, propriety or necessity of legislation. *National Ins. Co. v. Tidewater Co.*, 337 U.S. 582 (1949).

## VI

### Reopening the Article 32 Investigation

A proper Article 32, 10 U.S.C. § 832 session was held and a general court-martial was recommended. Subsequently, the charges were withdrawn after the results of Mrs. Stopper's tests were received. However, they were re-referred after Mr. Wraxall conducted his examination.

At an Article 39(a), 10 U.S.C. § 839(a) session on 4 April 1980, conducted after the re-referral of the charges, appellant moved to continue the trial until 2 June 1980 in order to inquire into the report submitted by Mr. Wraxall. The defense motion was granted and another Article 39(a) session was set for 26 May 1980. An additional session was conducted on 8 May 1980 in order to decide what matters would be litigated at the May 26 Article 39(a) session in view of the fact that some matters had been litigated prior to the withdrawal of the charges. The court decided that matters previously litigated would not be relitigated absent new evidence.

The defense then requested the reopening of the Article 32 investigation for the purpose of deposing Mr. Wraxall. The motion to depose was granted without reopening the Article 32 investigation.

▉ On 28 May 1980, the court convened an Article 39(a) session. Mr. Wraxall's deposition had been taken. After appellant was arraigned, the defense requested an additional Article 32 investigation "concerning the evidence brought forward by Mr. Wraxall." The motion was denied. Appellant contends this was error and that the case should be reversed and remanded for a new Article 32 session. We do not agree.

Appellant has not suggested on appeal nor before the trial court how consideration of Mr. Wraxall's report by an investigating officer would change the action of the convening authority who had the report before him with the amended pretrial advice when he re-referred the charges. In *United States v. Mickel*, 9 U.S.C.M.A. 324, 26 C.M.R. 104 (1958) the court held that if the accused is deprived of a "substantial pretrial right" that on timely objection he is entitled to judicial enforcement of his right "without regard to whether such enforcement will benefit him at trial."

In *United States v. Ledbetter*, 2 M.J. 37 (CMA 1976), the denial of a motion to reopen the Article 32 investigation and order the appearance of the key military witness for the prosecution was a deprivation of a substantial pretrial right. Appellant had previously requested the presence of this witness at the Article 32 investigation so that he could cross-examine him. The court also stated that the Article 32 investigation ". . . operates as a discovery proceeding for the accused and stands as a bulwark against baseless charges."

In *United States v. Chestnut*, 2 M.J. 84 (CMA 1976), the prosecutrix of a rape charge had not refused appearance at an Article 32 hearing but was erroneously determined unavailable by the investigating officer. The trial judge's adoption of the investigating officer's determination was error. The failure to grant a motion for

continuance to depose the witness required reversal. Again in *United States v. Chuculate*, 5 M.J. 143 (CMA 1978), the failure to give the defense the opportunity to depose two prosecution witnesses, one of whom was the victim of one of the crimes charged, was found to be a deprivation of a substantial pretrial right. Unlike *Ledbetter, Chestnut,* and *Chuculate,* appellant was given the opportunity to depose the witness and did so prior to trial. We do not believe he was deprived of the right of discovery or any substantial pretrial right.

## VII

*Appellant's Sworn Statement
in Extenuation*

During sentencing appellant testified under oath as to the events and facts that he believed showed an alibi. The military judge instructed the members to disregard this testimony. Appellant contends this was error. We do not agree.

 Evidence in extenuation "... serves to explain the circumstances surrounding the commission of the offense, including the reasons that actuated the accused but not extending to legal justification or excuse." Paragraph 75c(3), MCM 1969 (Rev). Appellant's testimony was on the merits and not in extenuation or mitigation. The military judge did not err. *See United States v. Tobita*, 3 U.S.C.M.A. 267, 12 C.M.R. 23 (1953).

## VIII

 The instruction on reasonable doubt given by the military judge was the same one condemned in *United States v. Salley*, 9 M.J. 189 (CMA 1980). Appellant did not object to the instruction nor request clarification. We decline to consider this issue which was not raised below. *United States v. Salley, id.*

## IX

 Appellant has requested a new trial based on newly discovered evidence. We construe his application as a Petition for New Trial under Article 73, UCMJ, 10 U.S.C. § 873 (1976), and deny the Petition since petitioner has not complied with paragraph 109e of the Manual which requires that the facts relative to the newly discovered evidence be supported by affidavit.

The Petition for New Trial is denied. The findings of guilty and the sentence are affirmed.

Senior Judge MITCHELL and Judge FOREMAN concur.