UNITED STATES, Appellee,

v.

Michael J. TEETER, Sergeant, U.S. Army, Appellant.

No. 42503.
CM 439290.

U. S. Court of Military Appeals.

July 18, 1983.

For Appellant: *Captain Kenneth G. Gale* (argued); *Colonel Edward S. Adamkewicz, Jr., Captain David N. England, Captain Edward J. Walinsky* (on brief); *Colonel William G. Eckhardt, Major Raymond C. Ruppert.*

For Appellee: *Captain John L. Plotkin* (argued); *Colonel R.R. Boller, Lieutenant Colonel John T. Edwards, Captain Paul K. Cascio* (on brief); *Colonel James Kucera, Captain Kenneth H. Clevenger, Captain Patrick M. Flachs.*

*Opinion of the Court*

COOK, Judge:

Appellant was tried by a general court-martial composed of officer members. Con-

trary to his pleas, he was convicted of premeditated murder, murder while perpetrating the offense of rape, and rape, in violation of Articles 118 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 918 and 920, respectively. All of the offenses concerned the rape-murder of Eva Ransom. Though the case was referred as capital, appellant was sentenced to be confined at hard labor for life, to forfeit all pay and allowances, and to be dishonorably discharged from the service. The convening authority approved the sentence, and the United States Army Court of Military Review affirmed. 12 M.J. 716 (1981).

The general facts of the case have been comprehensively set forth by the Court of Military Review and need not be repeated here. *United States v. Teeter, supra.* Suffice it to say, the victim was raped and foully murdered; appellant quickly was identified as the suspect (he was heard to exclaim, "I just raped a woman and she's bleeding like hell"); and he made a detailed confession to law enforcement personnel. We granted review of four assigned issues.[1]

## I

The first issue concerns the appropriateness of the testimony on the merits of three prosecution witnesses—PFC Larry King, Specialist Four Jack Lyttle, and Specialist Four Leon Papu. King testified that he knew appellant and worked with him on a daily basis for a period of about six months, commencing approximately one year before the charged offenses. King testified that appellant frequently discussed the subject of the devil, and that he claimed to have "dealings" with and to worship the devil. According to King, appellant said he was

trying to get out of this relationship, knew that it was the "wrong road," and wore a tattoo of Jesus Christ on his chest to "keep the devil from bothering him." Appellant also spoke admiringly of Charles Manson and "liked the way Manson controlled people."

Lyttle also knew appellant for about a year prior to the offenses. Like King, Lyttle had described having conversations with appellant about the devil. Appellant had said "that on occasions of when he couldn't get anything [speaking of women] on his own that he would go to the devil for help." One time Lyttle was present when appellant assumed a yoga-like position and, in an apparent trance, purported to commune with the devil. On another occasion, Lyttle recalled that appellant

> talked about women and what he would like to do to them. On that occasion, he said that he would like to take a road construction cone, or the barrel of a .357 and stick it up a woman's vagina.

Papu knew appellant for over a year prior to the charged offenses. He had heard appellant claim to have "almost the same ability that Charles Manson had, as far as controlling individuals to do things for him." Papu heard appellant on several occasions describe in graphic detail certain "techniques" to be utilized in torturing and killing women. Papu did not know exactly what to make of appellant's stories. As to some of what appellant said, Papu thought he was serious. As to the rest, Papu assumed it was "b___s___." In any event, Papu thought appellant's stories were "very, very weird."

1. Granted issues:

### I
THE MILITARY JUDGE ERRED BY ADMITTING PREVIOUS REMOTE STATEMENTS OF THE APPELLANT WHICH WERE HIGHLY PREJUDICIAL, HAD LITTLE PROBATIVE VALUE, AND WERE MADE UNDER CIRCUMSTANCES INDICATIVE OF INSINCERITY.

### II
THERE WAS NO EVIDENCE OF PREMEDITATION, THEREFORE THE MANDATORY LIFE SENTENCE WAS IMPERMISSIBLY SEVERE.

### III
THE FINDINGS OF GUILT OF "FELONY–MURDER" (SPECIFICATION 2 OF CHARGE I) SHOULD BE OVERTURNED AND DISMISSED.

### IV
THE MILITARY JUDGE ERRED BY INSTRUCTING THE JURY TO DISREGARD PORTIONS OF THE APPELLANT'S SWORN STATEMENT IN EXTENUATION.

Earlier in the trial, CID agent James Robinson described appellant's confession to him. Initially, the conversation centered around appellant's interest in witchcraft. Appellant explained that the tattoo of the figurehead of Jesus Christ on his chest was connected with his involvement in witchcraft and was designed "to overcome the power of evil and to overcome the devil." In addition, appellant described how he was able to "put himself into a trancelike state." When Robinson pressed appellant about the details of the crime, appellant apparently went into such a trance:

> [H]e started to become nervous and his hands started shaking, and his eyeballs rolled up into his head, and his eyes fluttered and he held his head up sort of like this (witness gesturing). And his voice got deeper and a little less audible, and I [Robinson] had a little more trouble hearing him but he was coherent.

While in an apparently normal state, appellant claimed to have no recollection of the events on the day in question from the time he parked his car at home until he was awakened on his couch after the victim's body had been discovered in her nearby apartment. While in these "trancelike state[s]," appellant described to Robinson in vivid detail his pursuit and killing of the victim. And he described the devil as "a sheep-like character with horns."

Robinson was asked by the prosecutor if appellant had mentioned anything specific about this "devil-like" animal. Robinson testified,

> He stated that the previous summer, this devil had told him that he—which he just said, "He told me that I would condemn ten people to death." I took it to mean that he was referring to the devil. And I asked him if Eva Ransom was the first person condemned to death, at which time he said, "The animal is telling me I killed Eva." And at that time, he started to shake a little bit. His right hand was

going like this (witness gesturing); and I asked him, "What are you doing?" And he said, "The devil is laughing at me." He said, "I'm trying to kill the devil." And I said, "Is the devil in Eva?" And he said, "Yes." And I said, "Did you kill Eva?" And he said, "I stabbed him." H–I–M, him. And I again said, "Is the devil in Eva?" And he said "Yes," and I said, "Are you killing the devil?" And he said, "Yes," making a motion like this.

At that point, the prosecutor interjected to describe that the witness was making a "striking downward motion several times with ... [his] right hand." In addition, appellant told Robinson that the devil was "all-powerful" and that the devil wanted appellant to hurt Robinson.[2]

The admissibility of the testimony of King, Lyttle, and Papu was hotly contested at trial. After extensive evidence and argument had been presented, the military judge denied a defense motion to suppress the evidence. The judge ruled that the testimony was admissible to show motive, intent, or state of mind. Subsequently, he gave the court members a limiting instruction to that effect.

 To be admissible, evidence must primarily be relevant. Further, it must not be "too remote to have any appreciable probative value." Para. 137, Manual for Courts-Martial, United States, 1969 (Revised edition).[3] Prior to the Military Rules of Evidence, statements by an accused were treated as hearsay. Paras. 139 *et seq.*, Manual, *supra*. *Cf.* Mil.R.Evid. 801(d)(2), Manual, *supra*. Even then they were admissible in their own right as confessions or admissions. Para. 140a, Manual, *supra*. But although relevant, evidence should be excluded if its prejudicial effect greatly outweighs its probative value. *United States v. Weaver*, 1 M.J. 111, 116 n. 4, (C.M.A.1975); *United States v. Thomas*, 6 U.S.C.M.A. 92, 19 C.M.R. 218 (1955). *Cf.* Mil.R.Evid. 403, Manual, *supra*.

---

2. Appellant's sanity was not challenged by the defense at trial. Indeed, two experts testified as prosecution witnesses that appellant was sane at the time of the murder.

3. This case was tried prior to the effective date of the new Military Rules of Evidence, Manual for Courts-Martial, United States, 1969 (Revised edition).

■ Admittedly, most of appellant's statements, as reported by King, Lyttle, and Papu, preceded the commission of the offenses by several months, some even by a year or so. Nevertheless, appellant's prior involvement with the devil, particularly as it related to women, was corroborative of appellant's statement to Robinson and shed light on his mental processes. In addition, appellant's professed admiration for Charles Manson and his ability to control people bore at least some relevance to appellant's alleged conduct, for we agree with the Court of Military Review's observation that rape and murder represent ultimate forms of control of one human being by another. *United States v. Teeter, supra* at 725. With respect to appellant's fantasies about torturing and killing women, the brutal manner in which Eva Ransom was murdered bespeaks volumes. Contrary to appellant's assertions, we do not find that appellant's statements, as reported by King, Lyttle, and Papu, were necessarily indicative of insincerity.

In short, we are satisfied that the evidence was probative of appellant's motive, intent, or state of mind. The military judge obviously balanced the probative value of the evidence against the danger of unfair prejudice to appellant, and we cannot say that he abused his discretion. Accordingly, we hold that he did not err in admitting the testimony.

## II

■ In his next assignment of error, appellant contends that there was no evidence of premeditation. *See* Article 118(1); para. 197*b*, Manual, *supra*. Therefore appellant contends that his mandatory sentence to life imprisonment is illegal. Premeditation is defined in paragraph 197*b*, Manual, *supra*, in the following terms:

A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act

intended. It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time. When a fixed purpose to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution. *The existence of premeditation may be inferred from the circumstances surrounding the killing.*

(Emphasis added.)

As the Court of Military Review noted, there was evidence that

appellant chased the victim until she fell and was rendered unconscious. He then tied her up, raped her, and, after placing a towel around her neck to catch the blood, proceeded to slit her throat. He then finished up by stabbing her 32 times.

*United States v. Teeter, supra* at 725. This evidence alone could have provided the court members a basis to infer premeditation. As a matter of law, the evidence of premeditation is sufficient. *United States v. Middleton,* 10 M.J. 123 (C.M.A.1981); *United States v. Wilson,* 6 M.J. 214 (C.M.A. 1979); *United States v. Brown,* 3 M.J. 402 (C.M.A.1977); *United States v. Taylor,* 21 U.S.C.M.A. 220, 44 C.M.R. 274 (1972).

Appellant also contends that the instruction on premeditation given by the military judge was inadequate. That instruction was:

Further, premeditated design to kill means the formation of a specific intent to kill and consideration of the act intended to bring about death. It is not necessary that the premeditated design to kill shall have been entertained for any particular or considerable length of time, though it must precede the killing. When a fixed design to kill has been deliberately formed, it is immaterial how soon afterwards it is put into execution.

Appellant did not object to the instruction or request additional instructions.

Specifically, appellant contends that the only difference in the instructions between premeditated murder and unpremeditated murder is the language pertaining to "consideration of the act intended to bring about death." This language, appellant

complains, was neither defined nor explained to the court members; nor need it be.

The words "consideration of the act intended to bring about death" are not terms of art. They have ordinary meanings and are readily understandable by court members. It does not appear that the court members had difficulty with the instruction since they did not request clarification. There is no requirement that length be substituted for clarity. In any event, if appellant was unsatisfied with the instruction, he had more than sufficient opportunity to object and to propose an alternative instruction. *United States v. Salley,* 9 M.J. 189 (C.M.A.1980). Failing this, and because clear injustice is absent, appellant's belated objection is untimely.

### III

In his third assignment of error, appellant challenges the felony-murder rule itself which was enacted in Article 118(4) of the Code. Appellant contends that the rule is an anachronism and urges this Court to abolish it. Indeed, the rule has come under criticism from some quarters. *E.g.,* W. La-Fave and A. Scott, *Handbook on Criminal Law* 560–61 (1972). Some jurisdictions have abolished the rule or limited its reach. Ky.Rev.Stat., § 507.020; Hawaii Rev.Stat., § 707–701; *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (Mich.1980); *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130 (Cal.1965).[4] However, the vitality of the rule under the Federal Constitution at this point seems unquestionable. *Lockett v. Ohio,* 438 U.S. 586, 602, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978); *Westberry v. Murphy,* 535 F.2d 1333 (1st Cir.), *cert. denied,* 429 U.S. 889, 97 S.Ct. 245, 50 L.Ed.2d 172 (1976); *United States ex rel. Stukes v. Shovlin,* 464 F.2d 1211, 1215 n. 8 (3rd Cir.1972). It not being our function to substitute our judgment for that of Congress, we decline to set aside Article 118(4) of the Code.

■ However, one aspect of appellant's argument has merit. As indicated, appellant was convicted of premeditated murder, rape, and felony-murder. The separate rape charge is fully included within the felony-murder charge[5] and might not have been charged at all. *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). On the other hand, premeditated murder contains the element of premeditation which is not present in felony-murder.[6] Therefore premeditated murder is not includable within felony-murder. *See United States v. Baker,* 14 M.J. 361 (C.M.A.1983). This would leave appellant in the somewhat anomalous position of being convicted of two separate murder charges for one slaying.

■ However, we note that the homicide elements of felony-murder are included within premeditated murder, and of course the rape elements of felony murder are the same as those of the separate rape charge. Indeed, all of the elements of felony-murder, not surprisingly, appear to fall within the elements of either premeditated murder or rape. Therefore, we hold that the felony-murder charge here is *multiplicious* with the other two offenses. *United States v. Baker, supra.*

### IV

■ The final issue concerns the appropriateness of the military judge's instructions to the court members to disregard portions of appellant's sworn statement during the sentencing phase of the trial. Appellant did not testify on the merits. After he was convicted, he made a sworn statement in extenuation and mitigation of sentence. During this testimony, he attempted to resurrect his alibi defense which had been presented on his behalf on the merits. Pursuant to government objection, the military judge instructed the members

---

4. *See also In re Joe R.,* 27 Cal.3d 496, 165 Cal.Rptr. 837, 612 P.2d 927, 931–35 (Cal.1980).

5. Paras. 197*e* and 199*a*, Manual, *supra.*

6. Paras. 197*b* and *e,* Manual, *supra.*

to disregard that portion of appellant's testimony. The judge added that, "[O]f course the remaining portions of the accused's testimony you may certainly consider."

Extenuating evidence "serves to explain the circumstances surrounding the commission of the offense, including the reasons that actuated the accused but not extending to a legal justification or excuse." Para. 75*c*(3), Manual, *supra*. Appellant contends that para. 75*c*(3) is unconstitutional and conflicts with Fifth Amendment due process. He bases this on two arguments. First, *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (privilege against compelled self-incrimination extends to penalty phase of trial), provides that the Fifth Amendment applies to both the guilt and penalty phases of a trial. Second, appellant observes that findings of guilt are not final until a sentence has been announced by the members. Para. 74*d*(3), Manual, *supra.* From these factors, appellant argues he has a right to contest his guilt throughout the entire criminal proceeding. But though a military judge should be liberal in allowing an accused "to explain the circumstances surrounding the commission of the offense," neither of appellant's authorities leads to the conclusion he would draw.

The record discloses that appellant was afforded a full and fair opportunity to present his defenses during the findings phase of the trial, and that he exercised that right extensively. We are aware of no obligation, either under the Constitution or elsewhere, to provide an accused two chances to defend on the merits. In our opinion, the procedures established by the Uniform Code of Military Justice, as implemented by the Manual for Courts-Martial, are generally sufficient to satisfy due-process requirements. As appellant's alibi testimony did not even marginally relate to matters in extenuation or mitigation, the military judge did not err in excluding such irrelevant testimony. *United States v. Tobita,* 3 U.S.C.M.A. 267, 12 C.M.R. 23 (1953).

The decision of the United States Army Court of Military Review is reversed as to Specification 2 of Charge I. Because that specification is multiplicious for all purposes with the other offenses, the finding of guilty thereof is set aside and that specification is dismissed. There is no possibility of prejudice as to sentence since the minimum sentence provided by Article 118(1) was adjudged. Accordingly, in all other respects, the decision below is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.