UNITED STATES, Appellee,

v.

Dwayne K. JEFFERSON, Private First
Class, U.S. Army, Appellant.

No. 51,458.
CM 445244.

U.S. Court of Military Appeals.

Aug. 25, 1986.

For Appellant: *William J. Holmes*, Esq. (argued and reargued); *Lieutenant Colonel Arthur L. Hunt* and *Captain Bernard P. Ingold* (on briefs); *Captain Thomas J. Feeney (on brief)* \*; *Major Eric T. Fromzen, Captain Peter D.P. Vint, Captain Annamary Sullivan.*

For Appellee: *Captain John F. Burnett* (argued and reargued); *Colonel James Kucera* and *Lieutenant Colonel Adrian J. Gravelle* (on briefs); *Major Byron J. Braun* and *Captain Andrew D. Stewart* \* (on brief).

*Jonathan J. Klein*, Esq. (reargued); *Gerard A. Dupuis*, Esq., and *Richard C. Yeskoo*, Esq. (on brief), for Committee on Military Justice and Military Affairs of the Association of the Bar of the City of New York.

*Homer A. Walkup*, Esq. (reargued); *Charles A. White, Jr.*, Esq. (on brief), for Judge Advocates Association.

*Captain Carl H. Horst*, JAGC, USN, *Major J.S. Uberman*, USMC, *Captain Robert A. Maguire*, USMCR, for Appellate Government Division, USN.

*Joe G. Adams, Jr.* (Third-Year Law Student) (reargued); *Carol B. Anderson* (on brief), for Clinical Program, Wake Forest University School of Law.

### Opinion of the Court

EVERETT, Chief Judge:

Appellant was tried by a general court-martial composed of officer and enlisted members in September 1983 at Mainz-Gonsenheim, Germany. Contrary to his pleas, he was found guilty of felony-murder, in violation of Article 118(4), Uniform Code of Military Justice, 10 U.S.C. § 918(4). The members sentenced appellant to a dishonorable discharge, confinement for life, forfeiture of $573.00 pay per month for 14 months or until discharged from the service, and reduction to the lowest enlisted grade. The convening authority approved this sentence except for reducing the period of confinement to 50 years and setting the period of forfeitures at 14 months. The Court of Military Review affirmed the approved findings and sentence.

Four issues raised by appellant were granted review by this Court and oral argument heard thereon. Subsequently we specified an additional issue and heard argument on it.[1] These issues, rearranged in the sequence in which they will be addressed, are:

A

WHETHER THE FINDINGS OF GUILTY OF FELONY–MURDER (THE SPECIFICATION OF THE CHARGE) SHOULD BE OVERTURNED AND DISMISSED.

---

\* Not regarding specified issue.

1. We are grateful to counsel for the parties and to the various amici curiae for the helpful briefs and argument presented to this Court on the specified issue.

B[2]

DOES ARTICLE 118(4), UNIFORM CODE OF MILITARY JUSTICE, 10 U.S.C. § 918(4) ENCOMPASS A PERSON WHO PARTICIPATES IN ONE OF THE FELONIES SPECIFIED THEREIN BUT WHO IS NOT ACTIVELY INVOLVED IN A KILLING WHICH OCCURRED DURING THE COMMISSION OF SUCH FELONY. *SEE ALSO* ARTICLE 77, UCMJ, 10 U.S.C. § 877.

C

WHETHER THE MILITARY JUDGE ERRED WHEN HE INSTRUCTED THE MEMBERS THAT THEY COULD FIND THE APPELLANT GUILTY OF FELONY–MURDER (THE SPECIFICATION OF THE CHARGE) AS AN AIDER AND ABETTOR WITHOUT TELLING THE MEMBERS THE PARTICULAR OFFENSE THAT APPELLANT MUST "AID AND ABET."

D

WHETHER THE MILITARY JUDGE ERRED WHEN HE ALLOWED PROSECUTION EXHIBIT 34 (A STATEMENT OF THE APPELLANT) INTO EVIDENCE, BECAUSE THE GOVERNMENT FAILED TO ESTABLISH THAT THE DOCUMENT WAS PROPERLY AUTHENTICATED AS AN ACCURATE AND COMPLETE COPY OF THE ORIGINAL.

E

WHETHER THE MILITARY JUDGE ERRED WHEN HE ORDERED THE DEFENSE COUNSEL NOT TO ARGUE PRIOR TO FINDINGS THAT A FINDING OF GUILTY OF THE SPECIFICATION OF THE CHARGE (FELONY–MURDER) RESULTED IN A MANDATORY SENTENCE OF LIFE IN PRISON.

I

The Government's case against appellant for felony-murder was based primarily on the testimony of Specialist Four (SP4) Anthony Marable. He testified that appellant approached him during the night of May 6 and asked him if he wanted to rob a cab driver. Specialist Marable eventually agreed to participate, and appellant handed Marable a bag containing a handgun which he assumed was loaded. All that was said about the planned robbery was that SP4 Marable and appellant would ride in the selected cab and another soldier, Specialist Four (SP4) Adolphus Morris, would follow in another car. There was no discussion about how the handgun was to be used.

According to SP4 Marable, he and appellant entered a taxicab at a cab stand. Jefferson sat in the front seat while SP4 Marable sat in the back seat with the handgun. At one point during the ride, appellant accused the cab driver, Mr. Walla, of going the wrong way and charging them too much. Walla stopped the cab and turned on the interior light. Specialist Marable testified that he saw Walla pull out what he (Marable) later determined to be "a toy gun" and began struggling with appellant. Specialist Marable shot Walla in the head twice at close range "[t]o stop all of this struggling and ... get it all over with." Specialist Marable could not recall what, if anything, appellant said to prompt Mr. Walla to reach for the toy gun.

After the shooting, Marable left the cab and walked to where SP4 Morris had parked another vehicle. Appellant "caught up with" him and had Mr. Walla's wallet. Specialist Morris took SP4 Marable and appellant to Jefferson's apartment, where they divided the money from the wallet equally among themselves.

Specialist Marable admitted that he had lied when he had talked to his company commander and first sergeant about the incident. Marable also admitted he had made untruthful statements to a Criminal Investigation Command (CID) agent and to a polygraph examiner. While in pretrial confinement, SP4 Marable made several

---

2. This issue was specified by the Court and was the subject of the reargument.

different offers to appellant to accept responsibility for various parts of the crime.

The Government presented evidence corroborating various portions of Marable's testimony. One of appellant's neighbors, Mrs. Helmstetter, testified that early on the morning of May 7, 1983, she had found in her yard a wallet with no money in it. The wallet was subsequently identified as Mr. Walla's by his fiancee.

Several items of physical evidence, including a plastic bag and a plastic cup, were found at the crime scene. Upon expert examination, the bag was found to have a fingerprint resembling appellant's. Moreover, on the night of May 6 a government witness had seen appellant with a plastic cup resembling the one found at the scene of the homicide.

Two military policemen testified that they had seen appellant with SP4 Morris on the evening of May 6, 1983. Jefferson had previously asked one of these policemen for information on how to register a .357 Magnum so that he could bring it back to the United States upon completion of his tour of military service.

A letter allegedly written by appellant to his congressman while he was in pretrial confinement was also admitted into evidence. Jefferson maintained in the letter that he had been asleep during the cab ride and had not known that SP4 Marable was going to rob Mr. Walla. Appellant also described in his letter how he came into possession of the handgun and his innocent purpose in having it with him on the night of the offense.

The defense presented no evidence on the merits. The court members, after hearing the arguments of both counsel and receiving instructions from the military judge, found appellant guilty of the charged offense.

## II

## A

Appellant complains that his conviction for murder results from a misapplication of the felony-murder rule. If so, this would not be surprising. "The existence and scope of the felony-murder doctrine have perplexed generations of law students, commentators and jurists in the United States and England." *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304, 306 (1980). Indeed, "[f]elony murder has never been a static, well-defined rule at common law, but throughout its history has been characterized by judicial reinterpretation to limit the harshness of the application of the rule." *Id.* 299 N.W.2d at 307.

Justice O'Connor has observed:

[T]he felony-murder doctrine, and its corresponding capital penalty, originated hundreds of years ago, and was a fixture of English common law until 1957 when Parliament declared that an unintentional killing during a felony would be classified as manslaughter. The common-law rule was transplanted to the American Colonies, and its use continued largely unabated into the 20th century, although legislative reforms often restricted capital felony murder to enumerated violent felonies.

*Enmund v. Florida,* 458 U.S. 782, 816–17, 102 S.Ct. 3368, 3386–87, 73 L.Ed.2d 1140 (1982) (O'Connor, J., dissenting) (footnotes omitted).

According to one source, at early common law most felonies were capital crimes, but attempts were punished as misdemeanors and accidental killings were not punishable at all. The felony-murder rule was an effort to create felony liability for accidental killings caused during the course of an attempted felony. See ALI, Model Penal Code § 210.2, Comment, p. 31, n. 74 (Off. Draft and Revised Comments 1980).

*Id.,* n. 28.

Although a few States have abandoned felony-murder,[3] the doctrine still prevails generally in some form. Clearly, Congress

---

**3.** Hawaii, Kentucky, and Ohio by statutory change and Michigan by judicial decision, *see*

*People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304, 312 n. 45 (1980).

opted for a version of the felony-murder rule when it enacted Article 118 of the Uniform Code, for it provides:

> Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—
>
> (1) has a premeditated design to kill;
>
> (2) intends to kill or inflict great bodily harm;
>
> (3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or
>
> (4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson; is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.

Why the drafters of the Uniform Code of Military Justice chose to establish an offense of felony-murder and authorize its punishment by death is not completely clear from the legislative history. See especially *Hearings on H.R. 2498 Before House Armed Services Committee*, 81st Cong., 1st Sess. 1240–44, 1246–52, 1259 (1949) (hereafter cited as Hearings). Probably a chief objective was to parallel the provisions of 18 U.S.C. § 1111—which designates as "murder in the first degree" a "premeditated killing" or a killing "committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery" and which provides a mandatory sentence of death or life imprisonment for this crime. Perhaps the drafters of the Code also anticipated that the existence of the felony-murder rule would tend to deter commission of the five dangerous crimes specified in Article 118(4) because anyone planning such activity might fear that in perpetrating the offense a death would occur—however accidentally—and that he would then be subject to the death penalty.

The drafters may have considered that a person who perpretrated any of the offenses specified in Article 118(4) usually would have contemplated the possibility that someone might be killed; and they may have believed that such contemplation would be very akin to premeditation, which authorizes conviction and punishment under Article 118(1). Such a rationale for enacting Article 118(4) would be similar to that articulated by Justice Holmes:[4]

> Now, if experience shows, or is deemed by the law-maker to show, that somehow or other deaths which the evidence makes accidental happen disproportionately often in connection with other felonies, or with resistance to officers, or if on any other ground of policy it is deemed desirable to make special efforts for the prevention of such deaths, the law-maker may consistently treat acts which, under the known circumstances, are felonious, or constitute resistance to officers, as having a sufficiently dangerous tendency to be put under a special ban. The law may, therefore, throw on the actor the peril, not only of the consequences foreseen by him, but also of consequences which, although not predicted by common experience, the legislator apprehends.

■ Without examining the history or rationale of Article 118(4), this Court upheld the Code's felony-murder rule in *United States v. Teeter*, 16 M.J. 68 (C.M.A. 1983). There the accused contended "that the rule is an anachronism and urge[d] this Court to abolish it." *Id.* at 72. In response, we acknowledged that "the rule has come under criticism from some quar-

---

4. O.W. Holmes, *The Common Law* 59 (1923). In somewhat parallel fashion, the Manual for Courts-Martial, explained:

> Experience has shown that the commission or attempted commission of these offenses is likely to result in homicide. The law recognizes this probability, and when an unlawful killing occurs as a consequence of the perpe-

tration or attempted perpetration of one of those offenses, the killing is murder.
Para. 197g, Manual for Courts-Martial, United States, 1951. Many reasons for retaining the felony-murder rule have recently been advanced in Crump and Crump, *In Defense of the Felony Murder Doctrine*, 8 Harv. J.L. & Pub. Pol. 359–98 (1985).

ters"[5] and that "[s]ome jurisdictions have abolished the rule or limited its reach." But as we explained, "the vitality of the rule under the Federal Constitution at this point seems unquestionable. [Citations omitted.] It not being our function to substitute our judgment for that of Congress, we decline to set aside Article 118(4) of the Code." *Id.* at 72. We still subscribe fully to what we said in *Teeter*; and so our present task is only to determine what Congress intended to be the coverage of the felony-murder rule in trials by court-martial—rather than to examine the desirability or logic of the rule.

### B

Appellant contends, however, that under the plain language of Article 118, he cannot be convicted of felony-murder because he was not a "person ... who, without justification or excuse, unlawfully kills a human being"—as is required for *any* type of murder. According to his view, because Marable killed Mr. Walla, only Marable could be convicted under Article 118(4). *Cf. United States v. Carter*, 445 F. 2d 669, 673–75 (D.C. Cir. 1971) (Fahy, J., concurring in part and dissenting in part).

By implication, the Court rejected this contention long ago in *United States v. Borner*, 3 U.S.C.M.A. 306, 12 C.M.R. 62 (1953). There three servicemembers had raped, or attempted to rape, a Korean woman. While the accused were fleeing the scene, one of them fired a shot which killed the victim. After all had been convicted of felony-murder, their appellate defense counsel argued

> that the crime of rape, if committed at all, was completed and the accused were fleeing the scene at the time Lee Chin Yong was killed. Consequently, there being no evidence of concert of action to accomplish his death and no conclusive evidence of the identity of his killer, the

convictions of each of the accused must be reversed.

*Id.* at 312, 12 C.M.R. at 68. The Court's reply was:

> Under these circumstances, the failure of the evidence conclusively to establish the identity of the actual killer is immaterial. *The crime of rape was in progress within the meaning of Article 118(4) supra, and each of the accused is equally guilty as a principal.*[6]

*Id.* at 313, 12 C.M.R. at 69 (emphasis added).

Before and after the decision in *Borner*, other felony-murder convictions rendered by courts-martial have been upheld even though the accused may not have killed the victim or even intended his death. *See, e.g., United States v. Hamer*, 12 M.J. 898 (A.C.M.R.) (accused not actual killer in rape felony-murder), *pet. denied*, 13 M.J. 378 (1982); *United States v. Talavera*, 2 M.J. 799 (A.C.M.R. 1976), *aff'd*, 8 M.J. 14 (C.M.A. 1979) (accused not actual killer in robbery felony-murder); *United States v. Lehmiller*, 50 C.M.R. 119 (N.C.M.R. 1975) (accused not actual killer in robbery-murder); *United States v. Brown*, 5 C.M.R. 249 (A.B.R. 1952). However, despite the weight of precedent against appellant's contention, we believe that he is entitled to judicial consideration of the question of statutory construction which he has raised because apparently it was not confronted directly in the earlier cases.

### C

This question should be answered against the background of the common law, which imposed vicarious liability for a killing committed by a co-felon. Indeed, the felony-murder doctrine apparently was first stated in a case allowing such liability. *Lord Dacres'* case, Moore 86; 72 Eng.Rep. 458 (K.B.1535).[7] There the defendant and

---

5. *E.g.,* W. LaFave and A. Scott, *Handbook on Criminal Law* 560–61 (1972).

6. In connection with its denial of a related petition for new trial, the Court reiterated that "it is

immaterial who actually killed Lee Chin Yong." 3 U.S.C.M.A. 313, 316, 12 C.M.R. 69, 72 (1953).

7. *See People v. Aaron, supra* at 307; Morris, *The Felon's Responsibility for the Lethal Acts of Others,* 105 U.Pa.L.Rev. 50, 58 (1956). The rule

some companions had been hunting without permission, when a member of the group killed a gamekeeper. The defendant was a quarter of a mile away at the time, but nonetheless he was found guilty of murder and hanged. Similarly, in another early case cited by commentators in connection with the origin of the felony-murder doctrine, a defendant was held liable for murder, although one of his servants had thrown the stone which killed the victim. *Mansell and Herbert's* case, 2 Dyer 128b, 73 Eng.Rep. 279 (K.B. 1558).[8]

"The classic formulation of the felony-murder doctrine declares that one is guilty of murder if a death results from conduct during the commission or attempted commission of any felony." ALI, Model Penal Code § 210.2, p. 30 (1980). Under this formulation, no specific requirement exists that to be convicted of felony-murder the accused must himself have killed or attempted to kill the deceased. Accordingly, in their application of the felony-murder doctrine, some courts have extended vicarious liability to allow conviction for felony-murder even when the deceased was killed by neither the defendant nor a co-felon.

Thus, in *Commonwealth v. Almeida*, 362 Pa. 596, 68 A.2d 595 (1949), later overruled in *Comm. ex rel. Smith v. Myers*, 438 Pa. 218, 261 A.2d 550 (1970), the defendant's felony-murder conviction was upheld even though the appellate court assumed that the victim—a policeman—had been killed by a fellow policeman as they pursued the defendant and his cohorts, who had committed an armed robbery. In *Commonwealth v. Thomas*, 382 Pa. 639, 117 A.2d 204 (1955), later overruled in *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472 (1958), the Pennsylvania Supreme Court even held that the defendant

could be convicted of the felony-murder of his co-felon, who had been fatally wounded by the shopkeeper they were robbing.[9]

In view of such cases which imposed broad vicarious liability for felony-murder, it would not be extraordinary for Congress to have intended somewhat similar results in trials by court-martial. Indeed, at one point in the hearings on the proposed Uniform Code there is a strong indication that some members of Congress wished to impose vicarious liability for a killing committed by a co-felon and that a change was made in Article 77 of the Code in order to facilitate this outcome. *See* Hearings, *supra* at 1240–44.[10]

On the other hand, if Congress decided not to impose vicarious liability for felony-murder—a liability which under Article 118 included the death penalty—that decision also would be understandable. Even prior to enactment of the Uniform Code, attacks had been made on some of the extensions of vicarious liability for felony-murder and on the harshness of the common-law felony-murder rule itself. Some critics were suggesting that said rule is properly concerned with the killer's state of mind and should not be confused with vicarious liability, which should be governed by principles of causation. *See, e.g.,* Morris, *The Felon's Responsibility for the Lethal Acts of Others*, 105 U.Pa.L.Rev. 50, 58–64 (1956). Furthermore, Article 118(4) authorized a death penalty, so Congress might well have chosen to limit its application to the perpetrators of the killing for many of the same reasons that three decades later led a majority of the Supreme Court to hold that capital punishment could not be imposed on someone convicted under the felony-murder

---

may have been borrowed from a Roman law doctrine. *Id.* at 58 n. 43.

**8.** Discussed in *People v. Aaron, supra* 299 N.W.2d at 308.

**9.** A like result—although not based specifically on the felony-murder rule—was reached in *Taylor v. Superior Court,* 3 Cal.3d 578, 91 Cal. Rptr. 275, 477 P.2d 131 (1970). *See People v. Cald-*

*well,* 36 Cal. 3d 210, 203 Cal. Rptr. 433, 681 P.2d 274 (1984).

**10.** *See* Appendix to this opinion. The significance of this legislative history is diminished somewhat by congressional failure, after the question had been posed during hearings, to provide more explicitly that vicarious liability would exist for felony-murder.

rule unless his culpability focused on killing or intending to kill the deceased.[11]

■ In response to our search for statutory language which might afford guidance as to vicarious liability, the Government and two amici curiae[12] point to Article 77 of the Code, which provides:

Any person punishable under this chapter who—

(1) commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission; or

(2) causes an act to be done which if directly performed by him would be punishable by this chapter;

is a principal.

As they emphasize, in the congressional discussion of whether the proposed Uniform Code imposed vicarious liability for felony murders, Article 77 was specifically mentioned as the potential source of such liability. Hearings, *supra* at 1240–44.

Because a person who "aids, abets, counsels, commands, or procures" the commission of a crime is made a principal by Article 77, we conclude that one who "aids, abets, counsels, commands, or procures" the unlawful killing of a human being by another may be treated for purposes of Article 118 as if he did the killing himself. Accordingly, if A aids and abets B in killing C, then Article 77 causes A to be treated for purposes of Article 118 as if he had killed C. Therefore, if A had an intent to kill or do grievous bodily harm when he aided and abetted B, he can be convicted of

murder under Article 118(2); *cf. United States v. Jackson*, 6 U.S.C.M.A. 193, 19 C.M.R. 319 (1955). If A had a premeditated design to kill C, he can be convicted of premeditated murder under Article 118(1)[13]. If, when he aided and abetted B in the killing, A was engaged in perpetrating a felony designated in Article 118(4), then he may be convicted of felony-murder under Article 118(4).[14] Thus, if Jefferson aided and abetted Marable in killing Walla and did so with a premeditated design to kill, he, too, would be guilty of premeditated murder; or, if Jefferson did so while engaged in the perpetration or attempted perpetration of robbery, he would be liable for felony-murder.

■ Conspiring with another to accomplish a result is similar to—but distinct from—aiding and abetting the other person to accomplish that result. *Cf. Nye & Nissen v. United States*, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); W. LaFave and A. Scott, *Handbook on Criminal Law* § 65, p. 513 (1972) (hereafter cited as LaFave). Thus, one who aids and abets another in the commission of a crime is not necessarily guilty of conspiracy to commit the crime. However, conspiracy involves a voluntary association in purpose that is akin to that present in aiding and abetting. Federal cases have established that a person will be held liable for a substantive offense committed in furtherance of a conspiracy, *Nye and Nissen v. United States* and *Pinkerton v. United States*, both *su-*

---

11. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Currently the Supreme Court is considering another case which involves the legality of imposing the death penalty on defendants who did not commit the killing. *See Tison v. Arizona, cert. granted,* —— U.S. ——, 106 S.Ct. 1182, 89 L.Ed.2d 299 (1986).

12. Wake Forest University Clinic Appellate Program and appellate government counsel for the Navy and Marine Corps.

13. A could be convicted of premeditated murder even if B, the actual killer, had not premeditated, or lacked the capacity to premeditate, a killing and could not be convicted under Article

118(1). 6 U.S.C.M.A. 193, 208, 19 C.M.R. 319, 334 (Brosman, J., concurring and dissenting).

14. If A aided and abetted B in killing C but did not either perpetrate or attempt to perpetrate a felony designated in Article 118(4) or aid and abet C in perpetrating or attempting to perpetrate such a felony, then it seems doubtful that he could be convicted of felony-murder under that Article. For one thing, he probably falls outside the letter of Article 118(4). More importantly, he lacks the state of mind towards which it is directed. Of course, he would be subject to conviction under Article 118(2).

pra,— although perhaps the liability does not extend to "crimes ... not reasonably foreseeable as a natural consequence of the unlawful agreement." *See* LaFave, *supra* at 513 (footnote omitted).

■ Although Article 77 does not specifically deal with the vicarious liability of a coconspirator, we believe that the language of Article 77(1) is broad enough to encompass it. Even without Article 77(1), the presence in the Uniform Code of Article 81, 10 U.S.C. § 881, which punishes conspiracy, and the existence when the Code was enacted of the above-stated Federal precedent affirming vicarious liability for coconspirators would suffice to demonstrate congressional intent to establish this liability in military law. Indeed, because the Federal Criminal Code (18 U.S.C. § 2) and the Uniform Code contain almost the same provisions for vicarious liability, it would be anomalous to conclude that only the former sufficed to impose vicarious liability on coconspirators.

Thus, if A and B conspire to kill C and B carries out the conspiracy, then, for purposes of Article 118, A also can be considered to have killed C. If A had the premeditated design to kill C—which would be almost inevitable if he and B had conspired to kill C—he could be convicted under Article 118(1). If the killing took place while A was perpetrating or attempting to perpetrate one of the five felonies set out in Article 118(4), he could be convicted under that subsection.

The same result would follow if A and B had conspired to carry out a robbery and the killing of C was pursuant to and in furtherance of the conspiracy. Thus, if Jefferson and Marable conspired to rob Walla and, while the robbery was being carried out, Marable killed Walla pursuant to this conspiracy, Jefferson also would be viewed as having unlawfully killed the victim. Accordingly, if he were engaged in

the perpetration or attempted perpetration of the robbery, he could be convicted under Article 118(4).[15]

Quite possibly the evidence in this case would have sufficed under a conspiracy theory to have established his liability for the slaying. However, this theory was not relied on by the Government at trial and no instructions were given thereon, so it provides no assistance to the Government in this case.

■ We turn next to Article 77(2), which makes a principal of anyone who "causes an act to be done which if directly performed by him would be punishable." Obviously, its language relies upon that of 18 U.S.C. § 2(b), which provides:

Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The Historical and Revision Notes to this subsection state:

It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensable element of the offense by an innocent agent or instrumentality, is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense.

Three opinions by Judge Learned Hand provide some insight into the meaning of this language. *See United States v. Paglia*, 190 F.2d 445 (2d Cir. 1951); *United States v. Chiarella*, 184 F.2d 903 (2d Cir. 1950); *United States v. Falcone*, 109 F.2d 579 (2d Cir. 1940). Under his interpretation liability under this provision requires some showing of purpose to accomplish a result or knowledge of the likelihood of the result; and the standard of causation is stricter than that which would sustain civil liability.

---

**15.** Jefferson would be vicariously liable under conspiracy law for robbery, and it might be argued that, even if he were not personally present, he was "engaged in the perpetration or attempted perpetration of" a robbery for pur-

poses of Article 118(4). Under this view, his vicarious liability for both the killing and the robbery would bring him within the purview of Article 118(4).

We note that Article 77(2) lacks the word "willfully" which appears in 18 U.S.C. § 2(b); but we do not know the full implications of that omission. Certainly Article 77(2) goes at least as far in imposing vicarious liability as does 18 U.S.C. § 2(b), but perhaps it was intended to go further.

Although Article 77(2) appears to provide a specific basis for applying in trials by court-martial generally recognized principles of causation, we believe that irrespective of Article 77(2), Congress intended these principles to apply. Thus, in *United States v. Varraso*, 21 M.J. 129 (C.M.A. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1645, 90 L.Ed.2d 190 (1986)—without specific reliance on Article 77(2)—we upheld the accused's conviction, even though she was absent at the time of the victim's death. The rationale was that she had created a situation where it was highly foreseeable, if not inevitable, that the victim would die; and so under familiar causation principles this conduct made her a principal in the unlawful killing of the deceased. Because she had killed and had done so with intent to kill or inflict great bodily harm, Varraso came within the terms of Article 118(2).

Does the conduct of one who joins in committing a dangerous felony create the same risk of death that was created by the accused's conduct in *Varraso*? Usually not; but still in some instances—especially where the felons are armed—the risk of death can be substantial. Indeed, as we have already observed, the risk generated by engaging in a dangerous felony is enough so that, at least under one view,[16] it demonstrates malice aforethought and justifies infliction of severe punishment in the event of a homicide. This foreseeability that someone's death may be a consequence of committing a felony provides a basis for holding a felon responsible for a

death that would not have occurred had the felony not been undertaken.[17]

The Government wishes to go even further. It contends that, because of the danger to life inherent in the commission of any of the five felonies specified in Article 118(4), Congress intended to establish a rule of law that engaging in one of these felonies must be conclusively presumed to be a cause of any death that occurs while the felony is being perpetrated or attempted. Under this construction of the Code, if an accused has engaged in the perpetration or attempted perpetration of one of the felonies specified by Article 118(4), then he must be considered to have caused the death of anyone who dies in the course of the felony. Thus, even if Marable pulled the trigger of the gun which fatally wounded Mr. Walla, Jefferson was also the "killer" for purposes of Article 118. Having satisfied the prefatory language in that Article, Jefferson would also fulfill the requirements of Article 118(4), if he was participating in a robbery of Walla when the homicide occurred.

This construction of the Uniform Code—which we adopt—is hard to square with the maxim that penal statutes are to be construed narrowly. However, it seems to conform to the common law; and in dealing with common-law offenses, we should give some weight to common-law precedents. *Cf. United States v. Acevedo-Velez*, 17 M.J. 1 (C.M.A. 1983) (construing Article 126 which prohibits arson). Also, to the extent congressional intent was expressed in the hearings on the Uniform Code, this construction implements that intent. Moreover, it conforms to the results reached in *Borner* and other cases involving trials by court-martial for felony-murder, as well as to the results reached in several other jurisdictions with statutory provisions rather similar to Article 118. *See, e.g., United States v. Carter, supra; Jones v. State,*

---

**16.** *See* n. 3 and accompanying text. For very different views see Note, *Felony Murder: A Tort Law Reconceptualization*, 99 Harv.L.Rev. 1918 (1986); *People v. Dillon*, 34 Cal.3d 441, 668 P.2d 697, 194 Cal. Rptr. 390 (1983); *People v. Aaron*, *supra.*

**17.** Of course, in trials by court-martial, as in other criminal trials, the causal relationship must be established beyond a reasonable doubt pursuant to proper instructions by the military judge.

568 P.2d 837 (Wyo. 1977); *State v. Paxton,* 453 S.W.2d 923 (Mo. 1970); *Garcia v. State,* 159 Neb. 571, 68 N.W.2d 151 (Neb. 1955).

To impose this vicarious liability squares with several of the purposes we might impute to Article 118(4). For example, if that subsection seeks to deter commission of the five designated felonies by attaching added penalties when the felony is attended by a homicide, then this purpose is furthered by the approval of a broad vicarious liability. Moreover, to the extent that Article 118(4) is concerned with punishing the *mens rea* of one who engages in a dangerous felony, there is as much justification for convicting of felony murder someone who joins in a felony-murder where the victim is killed by a cofelon as of convicting a person who himself accidentally or inadvertently kills the victim. *Cf.* LaFave, *supra,* § 64, p. 507.[18] Finally, to hold liable under Article 118(4) all those who participate in the felony during which a homicide occurs provides a rule that is simple to administer and avoids an outcome that would undoubtedly have been very troublesome to Congress—namely, that if the prosecution cannot establish beyond reasonable doubt which felon inflicted a fatal wound, then all must be acquitted of murder.

### III

■ Appellant argues that the evidence of record does not support his conviction for felony-murder. This argument would have considerable merit if we accepted his view that, under the language of Article 118, an accused may not be convicted of felony-murder unless he personally does the killing. However, we have rejected that contention; and the argument as to insufficiency of the evidence falls with it.

The evidence shows that appellant planned the robbery of a cab driver, arranged for Marable to participate, provided this triggerman with a loaded gun, selected the victim, directed the cab to a remote place, and instigated a confrontation with the victim which provided Marable both the time and opportunity to shoot him. This is a classic case of aiding and abetting a killing, *see* R. Perkins, *Criminal Law* 656 (2d ed. 1969); and so, under the provisions of Article 77(1), Jefferson is as much a principal in the killing as if he had pulled the trigger himself. Furthermore, his conduct created such a high likelihood that a victim would be killed, that the killing might be viewed as such a natural and probable consequence of that conduct that he may be held criminally liable for those consequences. *Cf. United States v. Jones,* 517 F.2d 176, 181 (D.C. Cir. 1975); *United States v. Wooten,* 1 U.S.C.M.A. 358, 366, 3 C.M.R. 92, 100 (1952). Finally, under our interpretation that Congress intended that one who participated in a robbery or other felony prohibited by Article 118(4) could automatically be held liable for any killing that occurred during the perpetration or attempted perpetration of the felony, the evidence was clearly sufficient because it was adequate to show that Jefferson was participating in the robbery of Walla, who died in the course thereof.

### IV

■ Appellant attacks the military judge's instructions to the court members as being inadequate and confusing. In his view, they failed to incorporate a key requirement—namely, that appellant must himself have killed the victim or aided and abetted in the killing. *Cf. United States v. Carter, supra* at 673–74.

The military judge instructed the members:

> You may find the accused guilty of an offense only if you are convinced as to guilt by legal and competent evidence, beyond a reasonable doubt, as to each and every element of the offense. *In the Specification of the Charge the accused is charged with the offense of felony*

---

**18.** Admittedly, *mens rea* is not the sole criterion for criminal liability. For example, the *mens rea* is the same for an attempt as for the commission of a crime and yet typically conviction for attempt authorizes less severe punishment than for completion of the offense.

*murder. In order to find the accused guilty of this offense,* you must be convinced by legal and competent evidence, beyond a reasonable doubt: That Ernst A. Walla is dead; that his death resulted from the act of the accused in engaging in the perpetration of a robbery, during which a co-perpetrator of the robbery shot Mr. Walla to death; that the killing of Mr. Walla was unlawful; that at the time of the killing the accused was participating in the commission of robbery. You are advised that the killing of a human being is unlawful when done without legal justification or excuse. To find that the accused was participating in the commission of robbery, you must find: That at the time and place alleged, that is on or about 7 May 1983, at or near Finthen, Germany, the accused wrongfully took a wallet containing an amount of German currency from the person of Ernst A. Walla; that this taking was against the will of Ernst Walla; that the taking was by means of force and violence; that the property belonged to Mr. Walla; that it was of some value; and that the taking by the accused was with the intent to permanently deprive Ernst Walla of the use and benefit of the property. A taking is wrongful when done without the consent of the owner and accompanied by a criminal state of mind. The force and violence required for this offense must have been applied to the person of the victim and either preceed or accompany the taking.

\* \* \*

You are advised that any person who actually commits an offense is a principal. Anyone who knowingly aids or abets another in committing an offense is also a principal and equally guilty of the offense. An aider or abettor must knowingly participate in the commission of the crime as something he wishes to bring about. He must aid, encourage, or incite the person to commit the criminal act. Presence at the scene of the crime is not enough. There must be an intent to aid

or encourage the person to commit the crime. *If you are satisfied beyond a reasonable doubt that the accused aided or abetted the commission of the offense, you may find him guilty of the offense even though he was not the person who actually committed the crime.* (Emphasis added.)

In assessing the sufficiency of these instructions, we first note that appellant was charged with felony-murder in these terms:

Charge: Violation of the Uniform Code of Military Justice, Article 118

Specification: *In that Private First Class Dwayne K. Jefferson, U.S. Army, Regional Personnel Center, Mainz, Germany, did,* at or near Finthen, Germany, on or about 7 May 1983, while perpetrating robbery, *murder Ernst A. Walla by means of shooting him in the head with a pistol,* said offense occurring outside the territorial limits of the United States and not being cognizable in a United States civilian court.

(Emphasis added.) The Government's evidence showed that Marable—not appellant—fired the shots that killed the victim during the robbery; and so the instruction on aiding and abetting must have been intended by the judge to provide a bridge between the allegation that appellant shot Walla and the evidence, which tended to show that Marable had shot the victim.

The difficulty with the instruction is that its reference to aiding and abetting an "offense" leaves unclear whether it is directed at aiding and abetting a killing or aiding and abetting a robbery. If the former, then by operation of Article 77(1), appellant may be treated as a killer for purposes of Article 118; and, if this killing occurred while he was perpetrating a robbery, then he was liable for felony-murder under Article 118(4). If, however, the aiding-and-abetting instruction was directed solely to the robbery, then the judge failed to advise the members of the legal basis for linking the robbery to the killing.[19] What it

19. The military judge also did not instruct as to causation or advise the members that a person

who committed a crime might be held respon-

amounts to then is that, under one interpretation of the judge's instructions on aiding and abetting—the interpretation which has apparently been accepted by both parties to this appeal—appellant could be found guilty of felony-murder solely on the basis of his committing, or aiding and abetting, the armed robbery of Mr. Walla.

Earlier in this opinion, we have explained that in our view, Congress intended to impose this broad vicarious liability. Therefore, even if the court members construed the military judge's instructions to allow them to convict Jefferson of felony-murder under Article 118(4) merely because he was aiding and abetting the robbery, appellant was not prejudiced.

Appellate defense counsel also suggest that, even on our premise that the felony-murder rule creates an automatic vicarious liability for a killing in the course of a felony, the instructions were inadequate. In their view, under a possible construction of the military judge's instructions, the members might have convicted Jefferson because they found that, although he had not participated at all in the homicide, he had subsequently stolen his wallet. Although we acknowledge that, under such a scenario, the stealing of the wallet after lethal force had been applied by another person might not authorize a conviction for felony-murder under Article 118(4), we do not believe that the judge's instructions were so ambiguous that the members might have convicted on this theory. While the instructions are no model for future felony-murder trials, defense counsel should have requested clarification if they felt that, under the evidence in the case,[20] the court members might have been confused as to what acts would be considered to be in the perpetration of a robbery.

sible for the natural and probable consequences of his actions.

20. When the findings are considered in light of the evidence, arguments, and instructions, it is clear that appellant was not prejudiced by the

## V

The next issue for consideration is whether the military judge erred in admitting prosecution exhibit 34—a redacted copy of a letter purportedly sent by appellant to his congressman. The defense had objected that the Government had failed properly to authenticate it as accurate and complete.

 The letter contained Jefferson's admission to being in the car at the time of the shooting and his explanation that he was asleep. Through evidence about appellant's signature on the original letter and about the processing of congressional inquiries, the Government adequately established the authenticity of the exhibit. However, even assuming arguendo that it failed adequately to explain the redactions made in this copy and even if the document was erroneously admitted under Mil.R. Evid. 1001(4) and 1003, Manual for Courts-Martial, United States, 1969 (Revised edition), we are sure that its admission did not prejudice appellant.

 The incriminating admission that Jefferson was present in the car was cumulative of other extensive evidence of this fact. For the most part, the letter was exculpatory and provided the only evidence favoring appellant offered by either side. Appellate defense counsel have urged that appellant was harmed by the judge's reception of this evidence. They claim that, because the letter was admitted in evidence, appellant was dissuaded from testifying—as he otherwise might have done. This argument is speculative, and we reject it. *See Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984). Indeed, if the introduction of this exhibit dissuaded Jefferson from testifying, it probably was because the letter placed his theory of defense before the factfinder and so it was unnecessary for him to testify—

ambiguity in the instructions. Hopefully in future trials for felony-murder the members will receive a clearer explanation of the basis for any vicarious liability to be imposed.

and thereby subject himself to cross-examination.

## VI

■ The final question in this case is whether the military judge erred in restricting defense counsel's closing argument on findings. *See* para. 74a (1) and 72(b), Manual, *supra.* The military judge, at the request of trial counsel, directed defense counsel to refrain from informing the members that the minimum sentence for felony-murder under Article 118(4) was confinement for life.

■ To the extent that such an argument may impress on the members the seriousness of their decision on findings, it is not inappropriate. *See State v. Walters,* 294 N.C. 311, 240 S.E. 2d 628, 630 (1978). However, in his opening argument, defense counsel had already informed the court members of the severe penalty for felony murder. Under these circumstances and in view of the obvious seriousness of the charged offense, we are convinced that appellant was not prejudiced by the judge's ruling.[21]

## VII

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

Judge SULLIVAN did not participate.

### APPENDIX

Mr. ELSTON. It would necessarily include all cases involving moral turpitude.

Mr. LARKIN. I should say so; yes.

Mr. ELSTON. I am wondering where you got your definition of principals and the manner in which they should be punished.

Mr. LARKIN. That came I believe from title 18 of the United States Code, section 2. The only variation from that definition there is that in title 18, section 2, after these words, there are the additional words "is a principal." And by virtue of the fact that we were trying to word this as we did in the first sentence to include spies, for instance, who are not subject ordinarily to the code, we revised it a little and it was criticized I think by some witness—I believe Mr. L'Heuseux. Where it says "any person punishable under this code who commits an offense punishable," that seems to be redundant. But we consciously did it that way rather than saying "any person subject to this code who commits an offense punishable," because spies are not otherwise subject to this code. But, to answer your question specifically, it comes from the Federal Code.

Mr. ELSTON. The words "shall be punished with the punishment provided for the commission of the offense," does that come from the Federal Code?

Mr. LARKIN. The Federal Code says "as a principal," which means the same same thing.

Mr. ELSTON. I do not know whether it does or not. You limit the punishment of a principal or an accessory before the fact to the punishment provided for the commission of the offense that he aided another to commit.

Mr. LARKIN. That is right.

Mr. ELSTON. The law goes further than that. Suppose he aided someone to commit the crime of robbery and in the perpetration of the robbery a murder is committed; he not only should be punished

21. When trial counsel made his motion *in limine* to preclude defense counsel from making further reference to the mandatory sentence for felony-murder, defense did not express opposition to the motion.

for the offense that he aided the other to commit, but for any offense which might reasonably be expected to flow from the commission of the act intended.

Mr. LARKIN. He aids in the commission of a robbery, and murder flows from it. The person who committed, or who was the active agent in the robbery I assume becomes the one who commits the murder, and the accomplice is the principal for all purposes in the act of the active participant and, as such, he is a principal in the murder.

Mr. ELSTON. You do not say that, though. You say "shall be punished with the punishment provided for the commission of the offense."

Mr. LARKIN. Which in that case is murder.

Mr. ELSTON. But read up above. You say:

Any person punishable under this code who—
(1) commits an offense punishable by this code, or aids, abets, counsels, commands, or procures its commission;

It seems to me you have got to go a little further than that or you are going to limit an aider or abetter to the offense committed, the offense that he aided another to commit, where he did not intend to commit the crime of murder, and intended only to commit the crime of robbery. He may have been a mile away from the scene of the crime; he may have furnished the weapon that was to be used in the commission of the robbery, but murder was committed, something that he did not intend. He may have advised against it but still, under the law, he would be guilty, because murder is something that might reasonably be expected to flow from the commission of the act that he thought was going to be committed.

Mr. LARKIN. Is that not true of the active principal who starts out with no intention of committing a murder but with the intention of committing a robbery and without intention to commit a murder, but, during the commission of the robbery, does so commit the murder?

Mr. ELSTON. That is understandable as to him; but the person who aided and abetted is limited, as your language seems to limit it, and might be punished only for the offense that he conspired to commit.

Mr. LARKIN. Of course, a conspirator is bound by all the acts of his coconspirators; is he not?

Mr. ELSTON. That is the theory of the law, but is it expressed here anywhere?

Mr. DeGRAFFENRIED. Mr. Larkin, is it true generally, under Federal law, that if a man were to plan, for example, with his confederates to break into a filling station at night and steal money from the cash register, but did not go with them to do it; but that when the crime was committed the night watchman, or somebody else, happened to come up and was killed by one of the people present, is it true under Federal law that that man, who is not on the scene of the crime, would be guilty of murder?

Mr. LARKIN. If you can prove he is part and parcel of the conspiracy, I think so. Is it not analogous to the case that where a principal or his instigator of a crime, or a procurer of a crime, hires a paid gunman, let us say, to go out and commit robbery, and he is not near the scene at all?

Mr. BROOKS. Gentlemen, I do not believe we can finish this before lunch. I am therefore going to suggest that we recess until 2 o'clock. Mr. Smart, for instance, has about 8 or 10 inquiries about these articles that should be covered.

Mr. LARKIN. Let us reserve judgment on that, Mr. Elston, and look up some of those cases. We shall try to do it very quickly. And, if it is not clear, I agree that we ought to correct it.

⊢ Mr. ELSTON. It is a very simple definition. Whoever aids, abets, procures another to commit an offense shall be charged and tried as a principal offender.

You have got them all, then.

Mr. BROOKS. If there is no objection, we shall recess until 2 o'clock.

(Whereupon the subcommittee took a recess until 2 p. m.)

#### AFTERNOON SESSION

The subcommittee reconvened at 2 p. m., Hon. Overton Brooks (chairman) presiding.

Mr. BROOKS. The committee will please come to order.

Mr. Larkin, since we recessed, have you and Mr. Smart gotten together on some suggestions of changes or interpretations of the articles?

Mr. LARKIN. Well, the one we were discussing, Mr. Chairman—namely, 77—I think would be cured or at least would meet the idea Mr. Elston had if we added the words, in line 80, page 65, "is a principal" and strike out the rest of the language on lines 8 and 9.

But I think, since Mr. Elston raised the point, perhaps we ought to reserve the suggestions until he returns; and, if it meets with his approval, why I think——

Mr. BROOKS. We might wait a little bit. Suppose we do this: Take up the other articles and then come back to his suggestion before we adjourn.

Mr. LARKIN. Fine.

Mr. BROOKS. I think Mr. Elston told me he would be a little late.

Mr. LARKIN. All right.

Mr. BROOKS. But I think he will be right back.

Mr. SMART. Mr. Chairman, in view of the previous decision of the committee to more or less consider these punitive articles en bloc, I have no further questions up to article 106, which I think needs clarifying as to the meaning of the word "lurking" on page 77, line 3.

I find that the intent was that the word "lurking" would mean "lurking as a spy." So, I would suggest an amendment on line 3, page 77, after the word "lurking," insert "as a spy."

Mr. BROOKS. So it will read: "Any person who in time of war is found lurking as a spy"?

Mr. SMART. Yes, sir.

Mr. LARKIN. "or"—

Mr. BROOKS. "or acting as a spy"?

Mr. SMART. That is right. There is some doubt as to the advisability of striking out the word "lurking," because it has historical significance and has been in the military law for many, many years.

This would definitely clarify the meaning of the word "lurking."

Mr. BROOKS. Is there any objection to that? I do not believe there is.

Mr. DEGRAFFENRIED. No.

Mr. BROOKS. If there is no objection, then we will adopt that suggested amendment.

Now, is there any other comment on 106? Are there any comments on any of these other articles covering punitive provisions of the code?

Mr. DEGRAFFENRIED. There is just one question I would like to ask as a matter of information.

Mr. Larkin, do you have anything in military law at all that provides in any kind of serious case that an accused cannot be convicted on the uncorroborated testimony of an accomplice?

Mr. LARKIN. There is nothing in the statute that I know of.

Mr. DEGRAFFENRIED. We talk about these accessories and all, and I just wondered in a lot of jurisdictions that protection is thrown around the accused.

Mr. LARKIN. Captain Woods points out in the Navy they have heretofore provided that the uncorroborated testimony of an accomplice, for instance, is not sufficient. I would anticipate that that same rule will be preserved and continued in the uniform manual.

I believe it is the Federal rule and we tried to adhere as nearly as possible to that rule.

Colonel DINSMORE. Mr. Chairman, my recollection, and I speak subject to correction, is that our rule is that he may be convicted on the uncorroborated testimony of an accomplice but that such testimony will be received with great caution.

Mr. DEGRAFFENRIED. That is all.

Mr. BROOKS. Any further questions?

Now, someone was telling me the other day, perhaps it was you Mr. Larkin, about a case arising in New York in which it was found, I think on a habeas corpus, that the service had no law to cover some very serious crime.

Do you recall that?

Mr. SMART. I think that is a Navy situation. I think that was a case which arose on one of the overseas islands where several sailors committed a murder.

In that situation, they were not attached to a ship and were not subject to capital punishment.

Captain WOODS. Is that the Saipan case?

Mr. SMART. Yes.

Captain WOODS. Yes. The point there was that our code provided that jurisdiction over murder pertained to outside the continental United States when attached to the ship.

These people were ashore and therefore we could not try them for murder.

So we had to retry them for manslaughter.

Mr. BROOKS. Now, is there anything in this code that takes care of that situation?

Captain WOODS. That takes care of it?

Mr. BROOKS. Under what article is that? That might be asked us on the floor.

Mr. SMART. That is article 118, "Murder." It does not restrict it as far as the territorial applicability of the code is concerned.

The code provides that it will be applicable in all places, so that covers ships, islands, continents, or whatever you have.

Mr. BROOKS. Mr. Elston has come in. We might turn back to that one particular matter that we were discussing, Mr. Larkin, and take that up and see whether or not your suggestion fits the situation now.

Mr. LARKIN. Well, as I pointed out, Mr. Chairman, I think this article if amended as follows——

Mr. BROOKS. What article is that, now?

Mr. LARKIN. Article 77, on page 65 will include the idea expressed by Mr. Elston. That is, on line 8, strike out all the words on that line and also on line 9 and substitute the words, "is a principal."

Mr. ELSTON. I do not quite get that. Where is that?

Mr. LARKIN. Page 65, Mr. Elston.

Mr. ELSTON. I have that.

Mr. LARKIN. Line 8.

Mr. ELSTON. Yes, strike everything on lines 8 and 9.

Mr. LARKIN. Yes, everything on lines 8 and 9?

Mr. ELSTON. Yes. So that starting with (2), it will say "causes an act to be done which if directly performed by him would be punishable by this code" and then drop to the next line, "is a principal."

So that in all those cases above he is a principal.

Mr. BROOKS. You do away with accessories completely?

Mr. LARKIN. No, sir. We just add to the end of that, "is a principal," which includes accessories before the fact.

Mr. BROOKS. Sure. I see what you mean there.

Mr. LARKIN. I think that cures the situation you had in mind, Mr. Elston.

Mr. ELSTON. That is all right: "or shall be punished as a principal offender"; either one.

Mr. LARKIN. Well, I think this one does it, do you not think so?

Mr. ELSTON. "Is a principal" reaches it.

Mr. BROOKS. Let me ask you, then: It take in all cases of accessories before the fact?

Mr. ELSTON. That is right.

Mr. BROOKS. And 78 merely covers those after the fact?

Mr. ELSTON. That is right. We have obliterated the distinction between the accessories before the fact and the accomplice on the scene.

Mr. BROOKS. Any further comment on that particular article?